## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| PETER R. CLIFFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 03-193-B-W |
| | ) | |
| COMMISIONER, SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDED DECISION ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Peter R. Clifford contends that the Social Security Administration (SSA) discriminated against him based on disability with respect to applications he made for three positions in 1999 and 2000, following his four-to-five-year separation from the SSA on disability retirement. The SSA has moved for summary judgment, offering as cause for Clifford's non-selection that the individuals hired were preferable to Clifford by virtue of their particular qualifications and/or their current experience within the SSA. In addition to challenging the legitimacy of this explanation, Clifford advances a theory that the SSA's policy of internally promoting current employees for high-grade managerial positions is discriminatory because it unlawfully prevents former high-grade SSA employees who left the SSA on account of disability from ever returning to positions at their former pay grade. I conclude that this "disparate impact" claim is procedurally foreclosed and that Clifford fails to generate a trial-worthy issue as to whether his non-selection was the product of actual discriminatory animus.

**Facts**

As with all summary judgment motions, the availability of any claim-dispositive ruling depends on the quality of the parties' factual proffers. To determine whether there is a trialworthy issue, I review the parties' competing summary judgment statements of material fact under the auspices of this District's Local Rule 56, as outlined in Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004).

*Clifford's background with the SSA*

Peter R. Clifford retired from the Social Security Administration in December 1995 on disability retirement because of multi-focal motor neuropathy, resulting in extremely limited motor function in his left hand and 50% use of his right hand.  (Pl.'s Statement of Undisputed Material Facts, Docket No. 24, Elec. Attach. # 1, ¶ 2.)  After receiving his BS from the University of Maine in 1971, Peter Clifford held the following positions with the Social Security Administration from July 1974 through December 1995:

      SSA Social Insurance Representative - 7/74 to 9/76
      SSA Quality Review Specialist - 9/76 to 10/80
      SSA Supervisory Quality Review Specialist - 10/80 to 5/84
      SSA Manager Quality Assurance - 5/84 to 7/85
      SSA Field Representative - 7/85 to 12/95

(Id. ¶ 3.)  During the last couple years of Clifford's stint as a field representative, changes at the SSA transformed his job into more of a "data-entry claims" or "claims representative" position, which required a significant amount of computer keyboarding and data entry. [1]  (Id. ¶ 3A.) Clifford asks the court to draw an inference that he "learned and used the SSA data system as a claims representative" during his last few years with the SSA.  (Id.)  However, the testimony he cites in support of this inference was not addressed to the question of his familiarity with the

---

[1]     Clifford's deposition testimony reflects that he did not have a computer terminal as a field representative until 1991 and that his use of the terminal increased over the years until his job became 90 percent keying "the last couple of years."  (Clifford Depo., Docket No. 34, at 42.)

SSA's current data and information systems, only to the nature of his former job duties at the SSA. I nevertheless do infer from this testimony that Clifford obtained a level of familiarity and exposure that a claims representative would have had with the SSA's data and information systems *circa* 1995. Peter Clifford has not been employed by the Social Security Administration since December of 1995. (Def.'s Statement of Material Facts, Docket No. 19, ¶ 1.) Subsequent to his departure from SSA employment, Clifford continued to be involved with social security benefits hearings as an advocate. (Pl.'s Statement ¶ 5.) In 1999 and 2000, Peter Clifford applied and was not selected for the following positions at the SSA that were consistent with his physical limitations: Public Affairs Specialist (PAS); Management Support Specialist (MSS); and Social Insurance Specialist (SIS). (Id. ¶ 6; Def.'s Statement ¶ 2.) With each application, Clifford submitted his last performance appraisal, which indicated that he had received an "excellent" rating. (Pl.'s Statement ¶ 9.)

*PAS Position and the MSS Position*

Lawrence DuBois was the selecting official for the PAS position. (Id. ¶ 3.) DuBois considered six candidates for the PAS position. (Id. ¶ 6.) DuBois reviewed application packages from all six candidates, but he did not conduct interviews. (Id. ¶ 7.) DuBois was looking for a strong and current public affairs background and technical background. (Id. ¶ 8.) DuBois considered that Social Security programs change often, and he felt that he needed to ensure that the candidate selected was aware of current programs, policies, systems, and services. (Id. ¶ 9.) DuBois considered that the selected individual would begin immediately without the benefit of training or preparation time. (Id. ¶ 10.) DuBois considered that Clark previously had primary responsibility for the public affairs program in the Portland service area for many years. (Id. ¶ 13.) DuBois considered that Clark was qualified technically, and he was previously called upon

by his peers and by management as a technical resource for policy and systems issues.  (Id. ¶ 14.)
DuBois concluded that Robert Clark was superior to the other candidates and selected him for
the position.  (Id. ¶¶ 11-12.)

DuBois was also the selecting official for the MSS position (Id. ¶ 4.)  DuBois reviewed
application packages from each MSS candidate, but he did not conduct interviews.  (Id. ¶ 16.)
DuBois was looking for someone with strong and current knowledge in matters such as program
policy and procedures, systems, and service delivery methods.  (Id. ¶ 17.)  DuBois considered
that there would be no training program for the MSS position, and he expected the selected
individual to function effectively immediately upon entering the position.  (Id. ¶ 18.)  DuBois
selected Betty DeRose for the MSS position.  (Id. ¶ 19.)  DuBois considered that she had been an
outstanding claims representative for more than 20 years, most recently in Augusta.  (Id. ¶ 20.)
DuBois also considered that DeRose had strong technical expertise and she had previously
served as the go-to person for her peers and management.  (Id. ¶ 21.)  DuBois also considered
that DeRose had experience as an MSS from a six-month (120-day) detail to that position in
which DeRose performed very well.  (Id. ¶ 22.)  DuBois concluded that DeRose had more
current knowledge and experience than did Clifford.  (Id. ¶ 23.)

DuBois's original intention was to announce both positions for internal selection only.
(Pl.'s Statement ¶ 29.)  DuBois questioned Clifford's inclusion on the list of best qualified
applicants for both jobs because Clifford was not an internal (current) SSA employee; but
DuBois was advised by the human resources branch of the SSA that inclusion of Clifford was
proper and DuBois proceeded to give Clifford the same consideration he gave the other
candidates.  (Id. ¶ 30.)  DuBois testified that he did not see Clifford's disability as impacting his
ability to perform either job if selected.  (Id. ¶ 33.)  To the best of DuBois's knowledge, the

candidate he selected for the PAS position (Mr. Clark) had no disability.  (Id. ¶ 34.)  DuBois had

no knowledge whether the candidate he selected for the MSS position (Ms. DeRose) had a

disability.  (Id. ¶ 42.)

*The Social Insurance Specialist Position*

Patricia Biggers was the selecting official for the SIS position.  (Id. ¶ 24.)  Biggers's

decision regarding the SIS position was based primarily on the application packages, but she also

conducted interviews.  (Id. ¶ 25.)  Biggers originally intended that the position only be advertised

internally and open to current employees, but Clifford appeared on the "best qualified list" and

was therefore considered by Biggers.  (Pl.'s Statement ¶ 60.)  Biggers understood that Clifford

was disabled.  (Id. ¶¶ 62, 74.)  When considering application packages for the SIS position,

Biggers reviews them for neatness and accuracy.  (Def.'s Statement ¶ 26.)  Biggers concluded

that Clifford's application package for the SIS position was not neat and contained errors.  (Id. ¶

27.)  Clifford does not dispute that his application package was not neat.  (Id. ¶ 49.)  Biggers

indicated that she also viewed unfavorably Clifford's statement during his interview that he

wanted the job in order to earn five more years toward his retirement pension.  (Id. ¶ 37.)

Another factor was his absence from the SSA for roughly five years.  (Def.'s Reply Statement ¶

77, citing Biggers Depo. at 67-74.)

Clifford's application package for the SIS position indicated that he left SSA in 1995.

(Def.'s Statement ¶ 28.)  According to the SSA, since 1995 its programmatic and automated

systems have changed significantly.  (Id. ¶ 29.)  Although Clifford admits this statement of fact

in his responsive statement of material facts (Pl.'s Response to Def.'s Statement, Docket No. 24,

¶ 29), he asserts in his statement of additional material facts that there have only been "very few

changes to the systems for managing and accessing data," none of them "major," and that what

5

few programmatic changes have occurred are similarly not "major."  (Pl.'s Statement ¶¶ 87, 90.)

In any event, Biggers has stated that she wanted to hire someone for the SIS position who had

current experience and was familiar with the SSA's systems and operating procedures.  (Def.'s

Statement ¶ 31.)  Biggers also wanted someone who would be able to handle the job immediately

with minimal training and supervision.  (Id. ¶ 32.)  According to Biggers, she concluded that

Clifford did not have experience with the current SSA systems and procedures.  (Id. ¶ 33.)  Also

working against Clifford, according to Biggers, was the fact that he had not previously held the

position for which he was applying.  (Def.'s Statement ¶ 33.)  Clifford denies that Biggers "so

considered" as part of the hiring process.  (Pl.'s Response Statement, ¶¶ 32-34.)  In support of his

challenge to these assertions, Clifford points to an affidavit executed by Biggers in which

Biggers indicated that these were not the *only* reasons she chose not to hire Clifford.  (Id., ¶¶ 33-

34, cross referencing Pl.'s Statement ¶¶ 75, 108-109.)  In the paragraph of the affidavit cited by

Clifford, Biggers asserted:

> I did not select Mr. Clifford because his application package did not communicate
> that he was the strongest candidate or the best qualified for the job.  When I
> receive an application package, first I review it for its presentation, which
> includes whether it is neat and has errors; I also look at the accuracy of the
> information contained therein and look at the clarity of its contents.  It was my
> opinion that Mr. Clifford's application package was not neat, it contained errors
> and scratch out, it was difficult to follow with respect to the work history because
> the dates were unclear and possibly not accurate.  The overall presentation of his
> application package was not good.  Then I look at the performance awards and Mr.
> Clifford had one or two performance awards.  Then I move on to take a close
> look at the work history and experience[.]  Mr. Clifford's application package
> communicated that he had no current experience as an employee with SSA.
> Consequently, I concluded that he did not have experience with the current
> automated and programmatic systems, since there was nothing in his application
> package to the contrary.  His package indicated that he left SSA in 1995.  Both the
> programmatic and automated systems have changed markedly since that time.

(Biggers Affidavit, Docket No. 6, Elec. Attach. # 1, ¶ 7.)  Despite contesting certain of the SSA's

statements concerning how Biggers considered Clifford, Clifford nevertheless admits that

Biggers concluded that Clifford was not the most qualified applicant for the SIS position.  (Pl.'s Response Statement, ¶ 36, admitting Def.'s Statement ¶ 36.)  Clifford also asserts in his own statement that it was Biggers's belief that the programmatic and automated systems at the SSA had changed markedly since 1995, the year Clifford left the SSA.  (Pl.'s Statement ¶ 65.)

Ultimately, Biggers selected two individuals for SIS positions who were current SSA employees, both of whom had a working knowledge of the current systems and procedures.  (Id. ¶ 38.)  Both of the individuals selected for the SIS position submitted application packages that were neatly and professionally presented.  (Id. ¶ 39.)  Both of the selected individuals had recently performed the same type of duties that would be supervised as part of the SIS position. (Id. ¶ 40.)  Clifford admits that Biggers selected the two people that she concluded had the best qualifications for the SIS position.  (Def.'s Response Statement ¶ 41, admitting Pl.'s Statement ¶ 41.)  Clifford himself states that Biggers did not select him because his application package was not neat, contained errors and scratch outs and because, after a close look at the work history and experience she concluded he did not have current experience with the SSA's automated and programmatic systems. (Pl.'s Statement ¶ 75.)

According to Clifford, the SIS position involved the same duties he had performed for the SSA in the various "quality assurance" positions he held between 1976 and 1985.  (Pl.'s Statement ¶ 14.)  While working in the Quality Assurance area as an officer and supervisor, among other things, Clifford was involved in the development, examination, investigation, adjudication and authorization of claims for all SSA programs.  (Id. ¶ 15.)  Although Clifford had not worked for SSA for four years at the time he applied for the positions in question, Clifford had kept abreast of SSA procedures and regulations through his work representing clients seeking SSA benefits and kept informed of job duties and procedures through former co-

workers, trade literature and publications, computer software and the internet; and by serving as the president and technical resource person for a large agency that served mentally handicapped people, he frequently provided assistance concerning SSA's work incentive programs and other SSA issues.  (Id. ¶ 16.)  Clifford asserts that Biggers never asked him if he had current knowledge of SSA regulations and procedures or current automated programs and procedures. (Id. ¶ 17.)  The SSA qualifies this assertion by stating that Clifford failed to communicate that he had knowledge of or experience with the current automated and programmatic systems and operating procedures used by the office.  (Def.'s Reply Statement, Docket No. 31, ¶ 17.)

Starting with paragraph 80 of his statement of material facts, Clifford offers numerous statements supported by citation to the deposition testimony of Norman E. Linden, Jr., a veteran SSA employee with over 30 years of experience with the SSA.  Mr. Linden's testimony appears to be intended to rebut the SSA's assertion that its programmatic changes, increased automation and new data systems placed Clifford at a competitive disadvantage against the current employees who were promoted to the positions that Clifford sought.  (Pl.'s Statement ¶¶ 80-96; see, especially, id. ¶¶ 91, 96.)  In particular, Linden is of the view that Clifford would have required only very minimal training in order to assume a managerial level quality control position like the SIS position.  (Pl.'s Statement ¶¶ 90-91, 96.)  The SSA objects to certain of the testimony because it is in the nature of opinion testimony and Clifford never designated Linden as an expert witness.  Other testimony appears to be belied by Clifford's own testimony.  For example, Clifford asserts that since he left the SSA in 1995, "there have been very few changes to the systems for managing and accessing data."  (Id. ¶ 90.)  However, during his deposition, Clifford testified that the SSA had added "tons" of new software, including the SSA's basic

computer software for processing claims (MISSICS), which Clifford describes as "coming in at about the time that I retired."  (Def.'s Reply Statement ¶ 90, citing Clifford Depo. at 62-64.)

## Discussion

A movant is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation.  Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

In his complaint, Clifford contends that he was the victim of both age and disability discrimination in relation to the SSA's hiring decisions.  At the summary judgment stage, Clifford fails to brief his age discrimination claim.  Accordingly, the sole issue is whether Clifford has presented a trial-worthy claim that the SSA refused to hire him because of his disability.  Because Clifford was an applicant for federal employment, his disability discrimination claim falls under the Rehabilitation Act, 29 U.S.C. §§ 701 et seq.  Calero-Cerezo v. United States Dep't of Justice, 355 F.3d 6, 11 n.1 (1st Cir. 2004); Mannie v. Potter, 394 F.3d

977, 982 (7th Cir. 2005).  The Rehabilitation Act has two separate provisions that might support

the maintenance of Clifford's suit: Section 501 (29 U.S.C. § 791) and Section 504 (29 U.S.C. §

794).  In his complaint, Clifford cites the Act generally and points to 29 U.S.C. § 794a as the

basis for this court's jurisdiction (Compl. ¶ 3), without highlighting either Section 501 or Section

504.  In any event, "Section 501 of the Act . . . requires federal agencies to accommodate

disabled employees and prohibits discrimination based on disability."  Id. (citing 29 U.S.C. §

791(b)); see also Prewitt v. U.S. Postal Serv., 662 F.2d 292, 306 (5th Cir. 1981) (observing that

"section 501 requires affirmative action on the part of federal agencies; unlike section 504 of the

Rehabilitation Act and Title VII of the Civil Rights Act which usually require only

nondiscrimination").  Section 501 also affords a private cause of action to remedy disability

discrimination in employment.  Williams v. Widnall, 79 F.3d 1003, 1005 (10th Cir. 1996).

Section 504 prohibits disability discrimination in the administration of federally-funded

programs, including programs administered by a federal executive agency.  29 U.S.C. § 794(a).

Unlike Section 501, Section 504 "require[s] a showing that the plaintiff's disability was the sole

reason for the defendant's adverse action."  Leary v. Dalton, 58 F.3d 748, 752 (1st Cir. 1995).

The First Circuit permits federal employees to pursue claims of disability discrimination in

employment under both Section 501 and Section 504.  Id.  However, Congress's remedial

offerings differ in some significant respects depending on whether Section 501 or Section 504 is

at issue.  Compare 29 U.S.C. § 794a(a)(1) and id. § 794a(a)(2); see also Lane v. Pena, 518 U.S.

187, 191-194 (1996) (holding that with § 504, unlike § 501, Congress has not waived the

Government's sovereign immunity against monetary damages awards).  Generally, the standards

used to determine whether a federal employer has violated the Rehabilitation Act are the same

standards as are applied under the Americans with Disabilities Act.  29 U.S.C. § 791(g).

Both the SSA and Clifford have analyzed Clifford's claim in accordance with the burden-shifting scheme set out in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-805 (1973). (Def.'s Mot. Summ. J., Docket No. 18, at 6-8; Pl.'s Response to Def.'s Mot. Summ. J., Docket No. 23, at 4.)  Utilization of that analytical scheme is appropriate.  See <u>MacDonald v. Cohen</u>, 233 F.3d 648, 652 (1st Cir. 2000).  That scheme calls for a three-part analysis.  First, the plaintiff must prove a prima facie case.  Success in that endeavor creates a presumption that the defendant engaged in discrimination.  Second, the burden shifts to the defendant to put forward a legitimate, non-discriminatory reason for its action.  If the defendant does so, the presumption of discrimination is dispelled and—in part three of the analysis—the burden returns to the plaintiff, who must adduce evidence capable of generating a genuine issue of material fact that his membership in a protected category was the determinative factor in the defendant's employment decision.  This last burden can be satisfied with evidence that the non-discriminatory reason put forward by the defendant in support of its employment decision was disparately applied or is unworthy of credence, "provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action."  <u>Rodriguez-Cuervos v. Wal-Mart Stores, Inc.</u>, 181 F.3d 15, 22 n.5 (1st Cir. 1999).  <u>See</u> <u>also</u>, <u>generally</u>, <u>Ronda-Perez v. Banco Bilbao Vizcaya Argentaria-P.R.</u>, 404 F.3d 42, 48 (1st Cir. 2005) (affirming entry of summary judgment in favor of employer where "the dozen perceived chinks in [employer's] reasons for terminating plaintiff let in no light as to any true reason [and did] not add up to the slightest suggestion of an effort to deceive or cover up a hidden motive"); <u>Chungchi Che v. Mass. Bay Transp. Auth.</u>, 342 F.3d 31, 39 (1st Cir. 2003) (observing that evidence of pretext "can be sufficient for a jury to infer discriminatory animus," that "there is no mechanical formula for finding pretext," and that "everything depends on the

individual facts") (citations and quotation marks omitted); <u>Dominguez-Cruz v. Suttle Caribe,</u> <u>Inc.</u>, 202 F.3d 424, 430 & n.5 (1st Cir. 2000) (indicating that the introduction of evidence tending to establish more than a prima facie case and pretext may be called for in some cases).

A prima facie case of failure to hire consists of the following elements:  (1) the plaintiff is a member of a protected class; (2) the plaintiff applied for an open position with the defendant-employer; (3) the plaintiff was not selected; and (4) the employer filled the position by hiring another individual with similar qualifications.  Cf. <u>Gu v. Boston Police Dep't</u>, 312 F.3d 6, 11 (1st Cir. 2002).[2]  The SSA does not articulate in its motion for summary judgment any particularized argument as to how or why Clifford's case fails to satisfy the prima facie standard.  Instead, in that portion of its memorandum entitled "Application of Law to Facts," the SSA argues that summary judgment is called for because the SSA "has proffered legitimate, non-discriminatory reasons for Clifford's non-selection in each of the three positions at issue."  (Def.'s Mot. Summ. J. at 8.)  As for its non-discriminatory reasons for not hiring Clifford to any of the positions he sought, the SSA states as follows:

> With respect to all three positions, the Social Security Administration was seeking to hire someone with current experience who could begin the job immediately without the need for training or preparation.  Those criteria were important because the Social Security Administration's systems and procedures had changed significantly since the time Clifford was last employed in 1995.  The selecting officials exercised their judgment and decided that the other applicants were superior to Clifford.

---

[2]     Additional elements may exist in disability cases if there is a question as to whether the plaintiff's alleged disability prevents him or her from being able to perform the job in question with or without a reasonable accommodation.  <u>MacDonald</u>, 233 F.3d at 651 (outlining the elements of a Section 504 claim: (1) that plaintiff applied for a position covered by the Rehabilitation Act; (2) that plaintiff is disabled; (3) that plaintiff was qualified for the job; and (4) that plaintiff was not hired solely because of his or her disability); <u>see</u> <u>also</u> <u>Crocker v. Runyon</u>, 207 F.3d 314, 318-19 (6th Cir. 2000) ("To make out a claim under the Rehabilitation Act, a plaintiff in a covered position must establish that he is: 1) an individual with a disability under the Act, 2) otherwise qualified for the job with or without a reasonable accommodation, and 3) being discriminated against solely because of his handicap.").  There is no suggestion in this case that Clifford's disability precludes him from performing the jobs in question.

(Def.'s Mot. Summ. J. at 8-9.)  In opposition, Clifford identifies the issue for consideration as "whether the Social Security Administration has proffered legitimate, non-discriminatory reasons for the plaintiff's non-selection," describing that issue as the issue on which the motion "turns." (Pl.'s Response to Def.'s Mot. Summ. J. at 5.)  However, after doing so, Clifford launches into a presentation of a disparate impact claim, which is followed by an argument in support of a "prohibited inquiry" claim under 42 U.S.C. § 12112(d).  I address those concerns first before considering Clifford's claim that he was not selected by DuBois and Biggers because of discriminatory animus.

*A.*     ***Disparate Impact***

Clifford argues that the SSA's policy of hiring internally for most, if not all, Grade 11 or higher positions (such as those sought by Clifford) has a discriminatory impact on disabled workers who have temporarily left SSA employment on disability leave.  (Id. at 7-8.)  According to Clifford:

> Because the SSA virtually always fills such higher grade positions through internal promotion, it systematically excludes qualified non-current employees, such as the plaintiff, from employment opportunities for which [they are] qualified.  It excludes SSA employees who retired because of their disability at a time when no other positions in SSA were available to them, from ever having the opportunity to return to SSA in such higher grade (GS-11 or higher) positions.

(Id. at 8.)  The evidentiary basis for this argument is various deposition testimony, including testimony by DuBois that he has "never hired Grade 12 from outside."  (Pl.'s Statement ¶ 23.)  In addition, the record reflects that it is the SSA's position that its inclusion of Clifford in the highly qualified pool of applicants was a mistake and that, in fact, the SSA concluded that only current employees were eligible.  (Pl.'s Statement ¶¶ 100-101.)  The SSA objects to Clifford's attempt to pursue a disparate impact claim because there is no mention of such a claim in the complaint and no disparate impact claim was ever presented at the administrative level.  (Def.'s Reply to Def.'s

Opp'n, Docket No. 30, at 1-2, citing Clifford's EEO affidavits, Docket No. 6, Elec. Attachs. 3-5.) As the SSA asserts, the affidavits Clifford submitted in support of his administrative claim make no mention of any policy having a disparate impact on disabled individuals. Nor does Clifford's complaint provide notice of such a claim. Ordinarily, the failure to exhaust a specific claim at the administrative level will preclude a federal employee from obtaining a judgment on the merits in court. Haithcock v. Frank, 958 F.2d 671, 675 (6th Cir. 1992) (involving a continuing violation theory). It appears that Clifford's disparate impact claim first appeared on the record in his opposition to the instant motion for summary judgment.[3] Although this might not necessarily present an absolute bar to the claim, Clifford has not sought leave to present argument in support of an equitable exception to application of the failure to exhaust doctrine. Moreover, allowing such a claim to proceed at this juncture presents a notice concern under Rule 8 because the complaint does not set forth a disparate impact claim or the kind of factual allegations that would give notice of such a claim. See, e.g., Pulla v. Amoco Oil Co., 72 F.3d 648, 658 (8th Cir. 1995) (affirming dismissal of disparate impact claim and denial of motion to amend, orders entered by the district court at the trial stage, based on the plaintiff's failure to allege a disparate impact claim). Assuming that Clifford first learned of an evidentiary basis for the claim during the discovery process, he never sought leave to amend his complaint. Accordingly, because the disparate impact claim was neither asserted in Clifford's complaint nor exhausted at the administrative level, I conclude that Clifford may not pursue it in this litigation.[4]

---

[3]       I have reviewed Clifford's response to the SSA's earlier, premature motion for summary judgment (Docket No. 7, responding to Docket No. 5) and there is no mention of any disparate impact claim therein.

[4]       For a primer on what a disparate impact Rehabilitation Act claim looks like, see Prewitt v. United States Postal Service, 662 F.2d at 306 ("In the discriminatory impact context, a plaintiff need not prove that the employer acted with discriminatory intent. All a plaintiff need prove to establish a prima facie case is that the challenged standard disparately disadvantages the protected group of which he is a member, and that he is qualified for the position under all but the challenged criteria. The burden of persuasion then shifts to the employer to prove that the challenged criteria are 'job related,' i. e., that they are required by 'business necessity.'") (citation omitted).

**B.**      *42 U.S.C. § 12112(d)*

Clifford next contends in his summary judgment memorandum that the SSA is liable to him because it identified him as eligible to apply by virtue of a "Schedule A Appointment" when it should have made the positions automatically open for him to apply to so that he would not be identified to selecting officials as eligible solely by reason of his disabled status. (Pl.'s Response to Def.'s Mot. Summ. J. at 12-14.) Once again, this claim does not appear to have any grounding in Clifford's complaint. My interpretation of this claim is that Clifford means for it to work in tandem with his disparate impact theory. In essence, he seems to argue that but for the allegedly discriminatory internal promotion policy observed by the SSA with regard to high-grade positions, he would never have had to identify himself as disabled because he would not have been required to apply under Schedule A.[5] Because this theory of liability is dependent on the premise that the SSA's internal hiring policy is unlawful, and that claim (discussed above) is procedurally out of bounds, I conclude that summary judgment should likewise enter on this component of Clifford's summary judgment presentation.

The SSA construes this aspect of Clifford's presentation somewhat differently. According to it, Clifford is complaining about the fact that he was identified to DuBois and Biggers as a candidate eligible under Schedule A, thereby disclosing to those with hiring authority the fact that he was a disabled candidate. (Def.'s Reply Mem., Docket No. 30, at 4.) I do not interpret Clifford's claim this way because Clifford concedes that "an applicant's disability related status and information can be released to a manager or selecting official that is seeking to utilize Schedule A to hire or appoint a disabled individual." (Pl.'s Response to Def.'s Mot. Summ. J. at 14.) In any event, even if Clifford were simply trying to state a claim for violation

---

[5]      Schedule A refers to a federal regulation that permits, but does not require, federal agencies to make appointments to positions based on certain factors other than competitive service, including severe physical handicap. MacDonald, 233 F.3d at 652-53 (citing 5 C.F.R. § 213.3102(u)).

of 42 U.S.C. § 12112(d), which prohibits certain medical exams and inquiries concerning a job applicant's disability status or the nature or severity of an applicant's disability, there was no prohibited inquiry in this case because there was no examination and the SSA was entitled to "make preemployment inquiries into the ability of an applicant to perform job-related functions." Id. § 12112(d)(2)(B).  There is no evidence presented in the summary judgment papers capable of supporting a finding that the SSA made anything more than preemployment inquiries designed to ensure that Clifford qualified for Schedule A consideration.

**C.      *Disability Discrimination***

Clifford's disability discrimination claim brings us back to the <u>McDonnell Douglas</u> burden-shifting scheme.  As addressed at the beginning of this discussion, the only aspect of the discrimination claim that is contested by the SSA is Clifford's ability to generate sufficient evidence of discriminatory animus.  On this score the SSA has produced evidence of legitimate, non-discriminatory reasons why Clifford was not selected for the three positions in question.  I address each position in turn.

*1.      The PAS position*

Mr. DuBois indicated that he found Robert Clark to be the superior candidate for the PAS position.  In addition to being a current employee, Clark was considered to have the greatest technical qualifications, a qualification that DuBois says he placed special weight on.  Clifford's challenge to this rationale consists of arguments that he was a superior candidate because of his many years with the SSA, including many occasions in which he made public appearances on its behalf,  and because he was scored during the prequalification process as having a "perfect" 35 rating on a "best certified" form, whereas Clark received a score of "only 32."  (Pl.'s Reply Mem. at 26.)  Clifford also contends that DuBois flatly ruled him out as an applicant because DuBois

was "adamant" from the beginning that the position should be filled by means of an internal

promotion.[6]  (Id.)  As to DuBois's assertion that Clark had superior technical skills and that

DuBois considered technical skill to be a preferred qualification, Clifford offers no challenge.

Generally speaking, Clifford would have to make an extraordinary presentation in order for the

court to be in a position to second-guess DuBois on the question of who could best fill the PAS

position and which qualifications were the most important because it is not the court's role to

"second-guess the business decisions of an employer, imposing [its] subjective judgments of

which person would best fulfill the responsibilities of a certain job."  Rossy v. Roche Prods.,

Inc., 880 F.2d 621, 625 (1st Cir. 1989).  In any event, Clifford does little to compare himself to

Clark.  His only direct comparison concerns each man's score on a list of the best qualified

candidates that was prepared as part of an applicant screening process by someone other than the

selecting official based on the representations contained in each applicant's application papers.

The list can be found as an electronic attachment to Clifford's response in opposition to the

SSA's initial motion for summary judgment.  (See Docket No. 7, Ex. 8-1 (Elec. Attach. # 6).)

The document in question is titled "Applicant List and Summary Rating Sheet" and is marked as

"Page 4 of 7" of Exhibit 8-1.  It lists the six candidates for the PAS position who were referred to

DuBois for consideration as the "best qualified" among all applicants based on a comparison of

the information related in the applicants' application papers to five criteria that are each scored

on a scale of 1-7.  (See Pl.'s Statement ¶¶ 48-49; Def.'s Reply Statement ¶¶ 13, 48-49.)  Two

applicants, Clifford included, received a 35 score, the highest possible score.  Two other

applicants, Clark included, receive a score of 32.  The two other applicants received scores of 27

---

[6]        This assertion is directly contrary to Clifford's suggestion that the SSA lighted upon the "current" employee qualification "after the fact" because it was the only criterion that the SSA, DuBois, Biggers and counsel could come up with to justify not finding him to be the most qualified candidate for all three positions.  (See Pl.'s Reply Mem. at 15, 27-28.)

and 29.  The best qualified candidates' relative scores on the list did nothing to restrict DuBois in his ability to select the candidate whom he found to be the best fit for the PAS position.  (Def.'s Reply Statement ¶ 13.)  I conclude that this 3-point discrepancy between Clifford and Clark on the prequalification/screening evaluation is not capable of generating a genuine issue as to pretext because it does not tend to prove that Clifford was the best fit for the PAS position in question.  Finally, Clifford complains that DuBois ruled him out because DuBois was "adamant" that the position should be filled by internal promotion.  This contention is not probative of pretext because it is consistent with DuBois's selection of Clark and with the SSA's position that the selectees' current employment status aided their applications.  Moreover, the contention does nothing to demonstrate discriminatory *animus* toward Clifford based on his disability, only favoritism toward current employees.  I conclude that Clifford's contentions concerning the PAS selection process are not sufficient to support a finding that DuBois's non-selection of Clifford was motivated by discriminatory animus.

     2.    *The MSS position*

As for filling the MSS position, Mr. DuBois indicated that his primary emphasis was finding a candidate with a strong and current knowledge in matters such as program policy and procedures, systems, and service delivery methods.  DuBois's selection, Ms. DeRose, was a candidate whom DuBois considered to have been an outstanding claims representative for more than 20 years, with strong technical expertise and with a reputation as someone whom management could rely on.  DeRose also had six-months experience in the MSS position, on account of a temporary detail in which she performed very well.  Although Clifford also had several years of quality control experience, that experience dated back to 1985.  As for "technical" expertise, particularly with computer systems, Clifford had only a couple of years

18

experience, dating to 1995.  In my assessment, this showing is not capable of supporting a

finding that DuBois's conclusion that DeRose[7] had more current knowledge and experience is

unworthy of credence.  Nor is it capable of generating a genuine issue as to the existence of

discriminatory animus.

       *3.*      *The SIS positions*

      Ms. Biggers provided several reasons why she did not chose Clifford over the other

applicants for the SIS positions.  Clifford's presentation does not expose any of the reasons as

pretext.  Clifford dos not dispute that his application was not entirely neat and contained errors.

Clifford also acknowledges that he stated to Biggers that he sought the job in order to earn five

more years toward his retirement pension, which statement, though honest, might be viewed

unfavorably by a selecting official.  Finally, there is the fact of Clifford's absence from SSA for a

five-year period.  Although Clifford contests the significance of this absence, he conceded in his

deposition testimony that there had been changes in the SSA's programmatic and automated

systems during his absence.  More significantly, Clifford admits that Biggers subjectively

believed that the programmatic and automated systems had changed markedly since 1995.

Clifford also admits that Biggers did not chose him because she concluded he did not have

current experience with the SSA's automated and programmatic systems.  Thus, even if there

were some question as to whether the individuals selected for the SIS positions were necessarily

---

[7]       Clifford attempts to discredit DeRose's qualifications with testimony from Mr. Linden that someone "whose only experience was working . . . as a claims representative . . . would need a lot of training to become qualified as an SIS."  (Pl.'s Statement ¶ 91.)  Contrary to Linden's characterization, DeRose's experience was not limited to working as a claims representative.  She had experience performing the MSS job on a six-month detail, which obviously undermines Linden's suggestion that DeRose would be less ready to step into this position than Clifford, whose supervisory experience ended 14 years ago and who has no current knowledge or experience with the SSA's data and information systems.

better suited than Clifford in all respects,[8] the presentation Clifford makes is not capable of generating a genuine issue as to the existence of discriminatory animus because he concedes that Biggers's non-selection of him was based on legitimate and non-discriminatory factors and not because she harbored discriminatory animus toward him on account of his disability.

## Conclusion

For the reasons set forth above, I conclude that Clifford fails to generate a genuine issue of material fact as to the existence of discriminatory animus and that the SSA is therefore entitled to summary judgment against Clifford's claim that he was discriminated against in the hiring process.  As for Clifford's contention that the SSA's policy of filling high-grade positions through internal promotion is discriminatory by virtue of a disparate impact it imposes on a class of job seekers who are disabled, retired, and former SSA employees, or his contention that the policy otherwise violates the Rehabilitation Act's affirmative action precepts (both of which questions appear to be purely legal), those avenues of relief are foreclosed procedurally by virtue of Clifford's failure to exhaust administrative remedies, to give notice of those theories of liability in his complaint, to seek leave to amend his complaint in order to preserve those claims and/or to seek leave to brief the question of whether an exception might apply to the exhaustion requirement based on the particular circumstances of this case.  Accordingly, I **RECOMMEND** that the court **GRANT** the SSA's motion for summary judgment (Docket No. 18.)

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the

---

[8]     Based on a review of the applications submitted by these individuals, Clifford asserts that neither had "any prior experience in Quality Assessment, while Clifford had over eight years of quality assurance and review experience."  (Pl.'s Statement ¶ 79.)

district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

      Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.


                   /s/ Margaret J. Kravchuk
                   U.S. Magistrate Judge

Dated: June 28, 2005